T. H. Beard, Appellant, v. H. B. Baxter, Appellee.

Gen. No. 8,318.

. Heard in this court at the October term, 1929. Opinion filed June 11, 1930.

RODES & HARLIN and BROWN, HAY & STEPHENS, for appellant.

GILLESPIE, BURKE & GILLESPIE, for appellee; LOUIS F. GILLESPIE and HUGH J. DOBBS, of counsel.

MR. JUSTICE ELDREDGE delivered the opinion of the court.

On November 10, 1925, a judgment by confession was entered in favor of appellant against appellee on four promissory notes for the principal and interest thereon in the sum of $27,629.85. Appellee made a motion to open up the judgment and for leave to plead and supported the same by affidavits. This motion was overruled and on appeal to this court the judgment of the circuit court in overruling said motion was reversed and the cause remanded with directions to grant the motion. *Beard v. Baxter,* 242 Ill. App. 480, 482. Upon the reinstatement of the case in the court below, pursuant to the mandate of this court, the judgment was opened up and appellee granted leave to lead to the merits and thereupon he filed a plea of general issue and 8 special pleas. A demurrer was sustained to all of the special pleas, and 14 additional pleas were filed thereafter by leave of court from time to time. To a number of these pleas demurrers were sustained and amendments made so that when the case came to trial the issues were presented by the ninth, tenth, eleventh, twelfth, thirteenth, fourteenth and twenty-third additional pleas. At the close of all the evidence the trial court withdrew from the consideration of the jury the twenty-third plea, and excluded all the evidence introduced thereunder.

The notes on which the judgment was entered were all executed at Springfield, Illinois, May 2, 1924, payable 6 months after date, to the order of E. Bryant Crump with interest at 7 per cent per annum from

date until paid and were signed by appellee, H. B. Baxter. They were all indorsed on the back by E. Bryant Crump. Two of these notes were for the principal sum of $5,000 each, one for $6,000 and one for $9,000, and each contained the usual power of attorney to confess judgment.

It is averred in the ninth additional plea that the several notes were without consideration of which fact the plaintiff had notice.

It is averred in the tenth, eleventh, twelfth and thirteenth additional pleas in substance that the notes were signed and delivered to Crump to enable the latter to obtain a "collateral reserve" for the development of certain asphalt deposits and upon his promise not to transfer or assign the same but to keep them in his name and use them only as such reserve to obtain money from other sources for the purpose of developing and selling such asphalt deposits and for no other purpose; that Crump having obtained said notes by reason of his promise aforesaid did not use them as "collateral reserve" or security to obtain money from other sources to develop and sell such asphalt deposits but assigned them to the plaintiff in violation of his promise aforesaid, and at the time said notes were so assigned to the plaintiff, the latter had notice that the consideration for the same had failed.

In the fourteenth additional plea it is averred that the notes were obtained from the defendant by duress and undue influence, that is to say, that at the time of their execution the defendant was 85 years of age, in a condition of mental infirmity and weakness, which rendered him incapable of transacting ordinary business and the said Crump well knowing said mental infirmities of the defendant and intending to defraud him by divers promises, professions of friendship, declarations of religious fervor, pretenses of favoritism and personal affection, which included cor-

respondence entered into between said Crump and the defendant for a year prior to the execution of said notes, obtained defendant's signature thereto and the delivery thereof to him and having isolated him from his family and obtained dominance over him and his mind and will fraudulently and falsely represented to him that he, said Crump, would not be able to complete an asphalt investment and pay to the defendant the sum of $55,000 which he then owed him unless the defendant would sign and deliver said notes to Crump to be used as ''collateral reserve'' or security in securing money from other sources to be used in completing or developing said asphalt investment; that said Crump by his personal influence and dominance over defendant as aforesaid induced the defendant to execute said notes without consideration and with the understanding and agreement that said notes were not intended to be and should not take effect or become valid and binding obligations of the defendant and should not be assigned or delivered by Crump and that the defendant should incur no liability by the execution of the same; that at no time did Crump or any person in his behalf pay or deliver to defendant any money or thing of value for the execution of said notes and the same were not executed upon any good and valuable consideration and were never delivered to Crump or to anyone in his behalf as a present and binding obligation; that Crump fraudulently and in violation of the agreement aforesaid and in furtherance of the design to defraud, transferred, assigned and delivered said notes to the plaintiff who took said assignment with notice of all matters and things aforesaid.

In the twenty-third additional plea it is charged that the plaintiff and Crump did unlawfully conspire with certain other persons to obtain the execution and delivery of said notes without consideration and by

the practice of a comprehensive scheme to defraud and that said notes were obtained by Crump pursuant to and in carrying out said unlawful conspiracy without consideration, by fraud and circumvention through the practice upon the defendant of the confidence game and were transferred to plaintiff pursuant to and in carrying out said conspiracy as an innocent holder for value without notice of defenses as between the defendant and Crump.

The jury found the issues joined in favor of the defendant and judgment was rendered upon the verdict, to reverse which, this appeal is taken.

Numerous errors have been assigned by appellant and nearly as many cross errors by appellee. The most material and important error presented by appellant is that the verdict is contrary to the manifest weight of the evidence. In order to prove the conspiracy between appellant, Crump and others as alleged in the twenty-third additional plea, a large amount of evidence was introduced by appellee which the court admitted upon the promise of counsel for the latter of further proof to show the connection of appellant with the conspiracy. The trial court held that appellant's knowledge or connection of such a conspiracy, if there was any, had not been shown by the evidence and excluded all the evidence introduced in support of this plea. As appellee has assigned this action of the court as one of his cross errors and as chronologically the facts sought to be proved by such evidence occurred prior to the execution of the notes in question and, as it were, formed the background of what transpired later resulting in the execution of the notes by appellee, in order to arrive at a proper understanding of the issues involved, it is necessary to discuss the facts in the order in which they occurred.

In 1922, Thomas H. Beard, appellant, resided at Bowling Green, Kentucky. At this time there was

what is commonly called an oil boom in Warren county, Kentucky and there were a number of producing oil wells in operation. There was an extensive business in the purchase and sale of oil leases and drilling of oil wells in the vicinity of Bowling Green. Appellant was cashier of the Citizens National Bank located in that city, and much of the business of the different oil companies operating in that locality was transacted through this bank. Appellee was a farmer residing in Cass county, Illinois and he and his sons owned large farms in that county. He was also vice president of a bank at Ashland and chairman of the board of directors thereof. At this time he was 84 years of age. Crump had at one time been a minister of the gospel but at the time in question owned and controlled a number of oil leases in Warren county, Kentucky and was devoting himself to the sale and exploitation of these oil lands. He sold some of these lands and interests in others to a large number of people in and around Ashland, the purchasers of which were men in nearly all walks of life including bankers, merchants, farmers and professional men. Many of these men, including appellee, went to these oil fields in Kentucky and looked at the property covered by the leases. On some of the tracts wells had been sunk and were producing oil, on others drills were operating in the sinking of wells. One witness testifies that at the time he made the trip to these oil fields there were three carloads of prospective purchasers of oil leases. It is undisputed that Crump was a bona fide owner of what he sold to the people in Cass county including appellee. About July 1, 1922, Crump called upon appellee and told him about his oil propositions in Kentucky and appellee asked him if any of the men of Ashland had been down there and traded with him and Crump showed him several notes which he had, one for $10,000 given by James Wyatt, cashier of the bank

of which appellee was vice president and another note by one of the directors of the same bank. The next time he saw Crump was about the 19th or 20th of October when the latter told appellee that he had a better lease than the one previously mentioned and that he wanted to sell it and appellee then invested in said lease and Crump gave him a written agreement that if appellee was not satisfied within a year with his purchase he would pay his money back. Subsequently he saw Crump again and the latter said if appellee would purchase a part of another lease he would give him a warranty deed for five acres of land besides, and the deal was consummated between the parties. In the latter part of October, 1922, Crump told him that a party of men were going from Ashland to look over the oil fields and requested appellee to go with them and the latter joined in this excursion. Appellee testified in regard to this trip in substance as follows: ''When we arrived at Bowling Green, Crump met us at the depot. We went to Crump's house. It is a big, fine house—good sized two-story house. We all went there. We took dinner there with him and we talked more or less about this oil business. After dinner we went to the fields to see the Rodes lease. We went to the bank and was introduced to the men in the bank. We met Rodes and Beard and McGuire. I met Beggs there who had formerly lived at Ashland; he was an employee of the bank at that time. *We had no conversation directly with the gentlemen in the bank—just passing acquaintances.* They showed us through the bank—the offices, upstairs and around. We went to the Rodes lease by automobile. I went to another lease or two besides the Rodes lease; we drove around quite a bit. I think the other lease was called the Hobson. I had bought the Kissler lease before I went to Bowling Green. I think we drove over that lease. There was appearance

of oil on the Rodes, Kissler and Hobson leases. I think there was oil on all of them. We went around the pumps that were running and different places over these leases, and I got up on the tanks—two different times to see if there was any oil coming out of the pipes and there was. It wasn't a very big flow of oil, just a small flow. I told Crump I wasn't satisfied with the Rodes lease. Then he said to me if I would· buy this other lease he would sell the Rodes lease within four months and pay my money back and wrote out a statement that he would pay it back in four months and thereupon I bought the Hobson lease. The arrangement I made with Crump was that if I was dissatisfied he would pay the money all back." The final result of the negotiations between appellee and Crump resulted in the former purchasing oil leases, lands or interests to the extent of $55,000. Appellee kept an accurate account in a book of the dividends he received from the oil produced on these various leases and testified as to each item thus received by him. These dividends were paid at irregular intervals of from one to three months, the last dividend being received in July, 1923. Some time thereafter Crump appears to have become financially involved in some way and his creditors foreclosed liens upon all his oil interests and those persons, including appellee, who had invested therein lost the amounts of their investments less the dividends received, and Crump because of his guarantee to return to appellee the money paid by the latter if he became dissatisfied with his investment became indebted to appellee in the sum of $55,000. Appellee kept pressing Crump for the repayment of this amount and at one time Crump sent him a check for $15,000 with the request that he would not present it immediately for payment. At another time Crump executed three notes, one for $6,000, one

for $4,000 and one for $5,000 payable to the order of appellee and one of these notes appellee sent to a bank at Madison, Indiana for collection. All the above testimony was admitted by the court under the twenty-third additional plea and subsequently excluded as before mentioned. Thus the situation stood between the parties on May 2, 1924, when the notes sued on in this case were executed by appellee.

On the last mentioned date appellee was living on the farm of one of his sons when a man by the name of Leahy came to him and told him (as testified by appellee) that Crump wanted to meet him at Bloomington at an early date to settle with him. Appellee and Leahy on the next day took the train at Ashland for Bloomington. When they arrived at Bloomington they were met at the depot by Dr. A. C. Baxter, a son of appellee, and they all went to the hotel where Crump was stopping and appellee asked Crump what he wanted. Appellee's version of this meeting is in substance: "He (Crump) said he was wanting some help to start an asphalt mill arrangement; and that he had a field of asphalt that was very valuable and if he had some help some way to start a mill there he could get lots of money out of it; and he wanted to know if I could do anything for him in any way. He said he would like to have $50,000. I told him, 'No, that is too much for me.' I asked him, 'What did you do with all that money you got down at Ashland? You must have got $400,000.' We talked about this money that he wanted. I told him I thought I had about enough—that I had put enough into that business; that I couldn't raise any money, and then he finally got down to that—he said if I could assist him with $25,000 it would be all right; but we talked the matter over that way and we didn't agree about anything. We finally got our dinner there and adjourned down to Springfield, and we all rode down in the son's

automobile—the son and I and Crump and this man Leahy. After we got down to Dr. Baxter's office at Springfield the doctor and I went into his private office and talked a little about this business and the doctor objected to it; he was opposed to the whole business. I kind of reasoned this way, I said if we could help him a little bit—I said, 'I am of an opinion and my own reason, that maybe if we could do something for the man he would pay us back all money he owed us,' so I called Crump into the doctor's office and told him, 'Now you take a piece of paper and set down right here how you can make payments with me provided I help you,' and he wrote out this paper here, saying how he would pay me every month so much money if I could assist him a little in getting so he could get his asphalt started. So he went to work and he wrote out this piece of paper that states how much he should pay every month. That paper is defendant's Exhibit 1. I told him when he sat down to write that paper, 'Now, all right, put in the first thing that you are to pay that $6,000 note that I sent down to Indiana,' and he did. He put it in, and then after that he was to pay $10,000 each month until he paid the whole business—everything he owed me. He was going to hold them (the notes) as collateral; he was not to sell them at all. He said he would hold them. I told him, 'You mustn't sell these notes of mine; you mustn't trade on them; you can keep them if they will do you any good that way,' and he said he would keep them—hold them. He gave as a reason for holding the notes as collateral that it would establish him a little reputation, he thought. He said he owned an asphalt field, and if he could get started on it with his mill and one thing and another, and selling it, there was a big lot of money in it—that he could make enough money to pay all his debts. He said he had a deed for it. He showed us a deed and I looked at

the deed, but I didn't read it over in particular, and it was signed by Crump, but it wasn't him—another Crump. He said it was his cousin; that he had it made to him because some parties were suing him and they couldn't take it away from him. I never heard from the notes I had signed and given to Crump until I was notified they were due. The Hardin Bank at Elizabethtown, Kentucky, notified me they had my notes there and they were due; that was the first I knew of them. I had confidence in Crump—at first I believed what he told me, but towards the last I did not. I relied on Crump's promises at first because he represented himself to be a preacher. I thought all preachers ought to be truthful.''

Defendant's Exhibit 1 referred to is as follows:

''Springfield, Ill.

''This certifies that I personally agree and bind myself in view of a $25,000 loan from H. B. Baxter this day made to me that I will pay six thousand dollars which is now lodged for collection at the Citizens National Bank of Bowling Green, Kentucky, May 12, 1924. It is further agreed that the said Crump will pay $10,000 on or before June 10, 1924, and $10,000 on or before July 1, 1924, and $10,000 on or before August 1, 1924, and $10,000 on or before September 1, 1924, and $10,000 on or before October 1, 1924, and $10,000 on or before November 1, 1924, and $10,000 on or before December 1, 1924, and $4,000 on or before January 1, 1925; and also agrees to pay seven per cent interest from time notes were given. Should the said Crump for any reason fail to make payments as herein set out he agrees and binds himself to turn over his asphalt holdings in Edmonson county, Kentucky.

''This May 2nd, 1924.

E. BRYANT CRUMP.

Witt. E. W. Leahy.''

Dr. A. C. Baxter testified in substance that he was notified by telephone that his father was going to

Bloomington and he went there to meet him; that when he met appellee and Leahy at the depot they went to the hotel to meet Crump and that the latter asked his father to give him $50,000 worth of notes to be used as collateral to increase his credit in order to develop some asphalt property in Kentucky and that if he could get his credit extended he would build an asphalt mill and by that means be able to pay his father what he owed him; that he told Crump that he had cost his father a great deal of money and that he was asking him to go into this again and that he (Dr. Baxter) couldn't agree to this and that he (Crump) was trying to defraud his father again; that he told his father he did not think that this was a safe proposition and he had no faith in the man; that his father answered that the man needed some help and no doubt he would pay him if he could get the help; that there was nothing further said about giving the notes while they were at Bloomington; that after dinner he took his father, Crump and Leahy in his automobile to Springfield where they went to his (Dr. Baxter's) office; that in the office he told his father that if he signed any notes for Crump he would be in trouble and his father told him that he would not sign for $50,000 but would for $25,000 and asked him to call Crump into the office; after Crump came into the office he (Crump) and his father talked about the payment of the debt that Crump owed his father and the manner in which he should pay the money and Crump drew up some kind of a contract and took some notes out of his pocket and handed them to his father who signed them; that the notes were already written; that no suggestion was made to Crump as to the contents of the contract by anybody present at the time; nothing was said by anyone aside from Crump about the time of payment of the various instalments to which it refers, nor with relation to turning over the asphalt lands to his father. He further testified that

nothing was said directly about the $6,000 note of Crump held by his father; that after the contract was signed his father said to Crump, "Now you are going to pay me what you owe me and you are going to take care of that note that I have sent to Kentucky for collection," to which Crump replied, "I will take care of that as soon as I can." It will be noticed that the testimony of Dr. Baxter is contradictory to that of appellee as to who suggested as to what should be embraced in the contract or Exhibit 1.

The only witnesses who testified in regard to the execution of the notes involved in this case were appellee and his son, Dr. Baxter. On the direct examination of Dr. Baxter the following answers were given by him to the questions asked:

Q. Did you read the notes over, or have them— examine them at any time?

A. No, sir. I noticed there was more writing on the notes than I was familiar with. *Nothing was said as to whether or not the notes should be assigned.*

Q. You may state if anything was said on the subject of these—what was to be done with these notes in any of these conversations, doctor?

A. The question was asked by me and by my father what he expected to do with these notes; in all these arguments we had had, he *said simply to be used as collateral to extend his credit.*

Subsequently Dr. Baxter was recalled for further direct examination and stated that he wished to correct his testimony given on his direct examination. He then testified: "In the conversation between the two men, my father asked Mr. Crump what he wanted the notes for and he said to put them up as collateral, and then my father asked him, 'Are you going to sell these notes?' and he said, 'No.' My father said, 'All right, they can not be sold,' and he said, 'Yes.' "

It is claimed by appellee that the above testimony given by him and his son prove the agreement made by Crump was not to assign or negotiate the notes in question. Crump assigned the notes to appellant who paid the $6,000 note which had been sent by appellee to the bank in Indiana for collection. These notes could not be used as collateral security by Crump unless they were assigned by him for that purpose. In Exhibit 1 it is specifically stated that they were executed by appellee as a *loan* to Crump and it is specifically provided therein how they shall be repaid. Dr. Baxter testified that he never read Exhibit 1 and did not know what was contained therein and that no one present made any suggestions as to what it should contain. It appears unreasonable that Dr. Baxter, who claimed he was present for the purpose of protecting his father from what he considered to be a fraud attempted to be committed on him by Crump and knowing, as he further testified, that his father's mental condition was impaired, would not at least have examined Exhibit 1 to see what it contained. After the notes were executed by his father and Exhibit 1 by Crump and the transaction was completed, Crump requested Dr. Baxter to take him in his automobile from Springfield to St. Louis where he was to take the train for some other destination. Dr. Baxter accommodated Crump in this respect and transported him in his automobile from Springfield to St. Louis so that the latter could catch a train at that place. It is not reasonable that Dr. Baxter if he believed, as he said he did, that his father had further been defrauded out of $25,000 by Crump would thus accommodate him in this way.

When Crump attempted to sell the notes to appellant the latter before he purchased them sent the following telegram to Dr. Baxter:

"Bowling Green, Ky., May 5, 1924.

"Dr. Albert C. Baxter,
Capitol Ave.,
Springfield, Ill.

"Dr. Crump has notes amounting to twenty-five thousand dollars signed by H. B. Baxter *that he wants to discount.* He wants to pay H. B. Baxter six thousand of this amount stop Does he still own his property at Ashland and in your judgment do you consider him good for the above amount.

Citizens National Bank,<br>T. H. Beard, Cashier."

To this telegram Dr. Baxter replied as follows:

"Springfield, Ill., 8:40 P, May 5, 1924.
"Citizens National Bank
Care T. H. Beard, Cashier, Bowling Green, Ky.
"*H. B. Baxter is good for the twenty-five thousand dollars* stop He owns his property at Ashland stop Paying his six thousand dollars is correct stop Is the asphalt proposition all right.

A. C. Baxter."

It is difficult to reconcile this telegram with the position taken by Dr. Baxter on the trial that his father and Crump had agreed that the notes were not to be negotiated and to the further fact that he considered that his father had been imposed upon and that at the time of their execution was not mentally capable of transacting business. On the same day appellant also telegraphed to the First National Bank at Springfield, Illinois, as follows:

"Bowling Green, Ky., May 5, 1924.
"F. H. Luers, Cashier,
First National Bank,
Springfield, Ill.

"Do you regard notes amounting to twenty-five thousand dollars signed H. B. Baxter good, desirable and collectible.

Citizens National Bank,<br>T. H. Beard, Cashier."

To this telegram he received the following reply:
"Springfield, Ills., 12:00 P, May 6, 1924.
"T. H. Beard,
Cashier, Bowling Green, Ky.

"From our information we believe Baxter notes twenty-five thousand dollars dated May second running six months are proper and should be paid on maturity.
First National Bank."

In reply to the inquiry as to the asphalt proposition mentioned in Dr. Baxter's telegram to appellant the latter wrote a letter as follows:

"May 10, 1924.

"Dr. A. C. Baxter,
201-2 Leland Bldg.,
Springfield, Ill.

"My dear Sir:

"I received your telegram advising me that your father still owned his property and that his notes for $25,000 were perfectly good, for which I wish to thank you. Dr. Crump paid the note for $6,000 and interest a day or so ago and same was remitted to the bank at Madison, Ind.

"In regard to the asphalt proposition, beg to say that Dr. Crump has some asphalt property in Edmonson county, which, I understand, is very valuable. The asphalt roads in this country are very good, indeed— better than concrete—and they have been very satisfactory here. I understand from experts or geologists and people that are in a position to know that Edmonson county has the best body of asphalt that has been discovered so far. I understand they have found asphalt in a number of places, but none of it has ever graded up to the Edmonson county asphalt. There is one company there known as the Kentucky Rock Asphalt Company that is doing the principal part of the business. Their plant is on the river and they ship by barge to Bowling Green and from there by freight and their output is used all over the country.

In fact they have been unable to supply the demands for the past few years.

"I am enclosing herein a letter from Col. M. H. Crump of this city, who is a practical geologist and stands very highly as a citizen here, which may be of some interest to you.

"Yours very truly,
Cashier."

The proofs show that at the time the notes were executed Crump did own valuable asphalt lands or interests therein as claimed by him.

In reply to the notice sent appellee requesting the payment of the notes he wrote as follows:

"Ashland, Illinois, April 25th, 1925.
"Rodes & Harlin,
Bowling Green, Kentucky.
"Dear Sirs:

"Your letter of 14th inst. received yesterday on my return from Florida. *I am very much surprised that these notes have not been paid.*

"The circumstance is Mr. Crump owed me a year ago a sum exceeding $30,000. I held his notes for that amount in denominations of $15,000, $6,000, $5,000 and $4,000. One of these notes, $6,000, I had placed in the bank in Bowling Green for collection. On May 2nd last year Crump came to me and said he had an asphalt farm of 400 acres in Kentucky and showed me a deed for it costing him $40,000; and said *that if he could have the use of $25,000 he could pay it all back as well as what he owed me within the present year, saying he wanted to use the $25,000 to put up a mill to crush the asphalt and build some tracks,* and I entered into a written contract with him before witnesses very binding in which *he agreed to pay those notes* and also all he owed me besides within the year which will be up May 2nd next. It was stipulated in his contract that he was to pay the $6,000 note then in the bank of

Kentucky during that month, May, and also that he was to pay a certain amount each month up to the month of January, when all would be paid.

"He paid the $6,000 on due time. Next he paid $1,500 and later $1,000, a total of $8,500, with some interest. I saw him in October *and he promised me he would attend to those notes.*

"I went to Florida in December and was gone for four months and just got home a few days ago and I did not know but what Crump had paid those notes off long ago, yet I knew he had not kept up his payments with me. Now if Crump does not pay those notes off he will get himself into trouble, as I hold a strict contract acknowledged before witnesses. I want you to see him and note what he says about it and let me know what he says and I may have to go to work on him.

Yours truly,<br>H. B. Baxter."

And also another letter as follows:

"Ashland, Illinois, May 5th, 1925.

"Messrs. Rodes & Harlin.

Bowling Green, Ky.

"Dear Sirs:

"Your letter of 1st inst. received today and in answer will ask *that you give me time to get in communication with Mr. Crump* or that I can go and see him. I had a letter from his clerk yesterday in which he said Crump was away from home but would be back in a few days. *Of course those notes must be paid but as Mr. Crump promised to pay them, I made no preparation to pay them.* I wrote you in my other letter for you to see him and report to me what he said about it. If Crump does not settle these notes, I will have to sue him on his contract and of course that will take some time.

"I am writing him again today and I will write you as soon as I hear from him.

Yours truly,
H. B. Baxter.

"P. S. I inclose a letter from Mr. Crump's secretary."

Two other letters written by appellee are as follows:

"Ashland, Illinois, May 11th, 1925.

"Messrs. Rodes & Harlin,
Bowling Green, Kentucky.

"Dear Sir:

"Has Mr. Crump paid anything on those notes yet? He was in the east recently negotiating some paper and said as soon as he returned he would pay those notes off. Call on him as soon as he returns and let me know what he says.

Yours truly,
H. B. Baxter."

"Ashland, Illinois, May 11th, 1925.

"Messrs. Rodes & Harlin,
Bowling Green, Kentucky.

"Dear Sirs:

"I received your letter containing blank notes and proposition, *which I consider fair of you,* but it seems to me after due consideration that the best thing to do will be to see what Mr. Crump is made of. I believe I told you before how Crump came to owe me and how I came to give him the five notes for $25,000. *When I gave him the 5 notes he entered into a contract to pay so much a month until this $25,000 and what he owed me besides was all paid, which was to all be paid within one year from May 2nd, 1924.*

"These payments were to be $6,000 in May, 1924; $10,000 in June, and so on $10,000 per month until the whole amount was paid. He paid on May 10, 1924, $6,000 with $113.37 interest. Then he fell back on various reasons and promises and paid no more un-

til September 8, 1924, when he paid $1,500 and then on Oct. 24, 1924, he paid $1,000, making a total of $8,613.37. I have been quite easy on him and *still have urged him all the time for more prompt payment, especially the notes in payment now you hold. He owes me more than the $25,000 amounts to besides. I would prefer to have you collect the notes and a check on him I send you and apply the proceeds on your note—you have on me.*

"Inclosed you will find two notes, $5,000 and $4,000, at 7 per cent interest and a check for $15,000 given me more than a year ago, which he has written me more than once to hold a little longer and give him time. I told him I would hold my accounts back so he *could better see his way to pay your notes you hold.* I had word from him but a few days ago as I wrote you this morning that he would pay those notes as soon as he returned from the east, where he went to arrange some money matters. So I think the best thing to do is to push him up and make him pay. We cannot live on promises always. He ought to pay interest on the check of at least 6 per cent. He got this money of me to fit up his asphalt plant, which he agreed to turn over to me if he failed in payment; this I have not asked him to do yet. Tell him I will not wait longer, but if he will pay your amount I will still give him time on balance; otherwise I will have you sue him on full amount of contract.

Yours truly,<br>H. B. Baxter."

In none of these letters is there any suggestion that Crump had promised not to assign the notes or that the notes were void for any reason. From the undisputed documentary proofs in the case the manifest weight of the evidence undoubtedly shows that there was no understanding or agreement between Crump and appellee that the notes were not to be negotiated

by Crump. It is inconceivable of Dr. Baxter, when he knew that Crump was trying to negotiate the notes to appellant not to have replied to the inquiry of appellant that the notes were not to be negotiated, instead of assuring appellant that the notes were good and collectible. Nor is it conceivable that appellee should not in any of his letters mention the fact that this agreement with Crump was that the notes should not be assigned. In the letter of May 5, 1925, appellee states: "Of course those notes must be paid but as Mr. Crump promised to pay them, I made no preparation to pay them." He also sent the old notes, executed by Crump, to appellant with the request that the latter collect them from Crump and apply the proceeds on the notes in suit.

As to the question of the mental competency of appellee to transact ordinary business but one witness testified upon this question. He was Dr. Baxter, his son, who testified that up to the year 1917 appellee's health had been fairly good; in January of that year he was sick; one morning as he was getting out of bed he had a fainting spell, fell on the floor unconscious and was picked up by the housekeeper, placed in bed and medical aid was called; that he was confined to his bed for several days; at this time he began to develop a tremor in his hands especially when he attempted to use them in eating or drinking; about this time he began to become secretive in his business and careless in his habits of personal appearance; that he had subsequent attacks of similar nature to the one he had in 1917; in 1924, he had ideas of grandeur; he thought he was one of the best business men in the country; my opinion is that he was troubled with senile dementia and that the symptoms were slowly progressive; I had some business transactions with him about that time in connection with the farms that we had in partnership; he had been managing farms

up to that time; he made contracts with renters and transacted business with me relative to the rents; I am a physician regularly engaged in the practice of medicine in Springfield and have frequently sat on commissions of insanity; have made a study of the mentality of the mind; in my opinion father in the year 1924 was not mentally competent to transact ordinary business; in 1922, he made some investments in lots in California which were worthless. Another witness testified as an expert as to the symptoms of senile dementia. This witness was asked a long hypothetical question to which the court sustained an objection, so that the only direct testimony on the question of the mental competency of appellee was that of his son, Dr. Baxter. Appellee was vice president of the bank at Ashland but none of the officers or employees of the bank were called upon to testify as to his mental condition. He also managed the farming of about 1,500 acres of land, made the leases with the tenants, collected the rents and paid the expenses thereof. He was a prominent and well-known man in the community where he lived but none of his acquaintances, friends, or business associates were called upon to testify that he was mentally incompetent to transact the ordinary affairs of business. The fact that at the time he executed the notes he was 84 years of age is not *per se* evidence that he was mentally incompetent to transact the ordinary business affairs of life and in fact the evidence shows that at that time he was very actively engaged in the transaction of business. There is nothing in his verbal testimony nor in his correspondence which would necessarily indicate that he had any mental deficiency, and under this condition of the record the testimony of Dr. Baxter on this issue cannot be considered of much weight.

Appellant when he purchased the notes from Crump did so at a discount of $3,000. He also compelled

Crump to apply a part of the proceeds in payment of certain obligations which the latter owed the bank. Crump also directed him to pay the $6,000 note held by the bank in Indiana in accordance with the provisions of Exhibit 1 so that he received in cash from the net proceeds from the sale of the notes about $15,000. It is contended by appellee that these facts tend to show that appellant had notice that title of Crump to the notes was defective and became charged with knowledge of all defenses that appellee might have thereto. There was nothing in these acts which raised any such presumption and the evidence is barren of any facts tending to prove that appellant had any knowledge whatever of the facts and circumstances surrounding the execution of the notes unless it can be said that the testimony introduced by appellee, and afterwards excluded by the court, in support of the 23rd plea charging appellant with a conspiracy with Crump and others to procure the execution of the notes by fraud can be construed to sustain that plea. We will briefly review the evidence on this question.

The witness Beggs formerly lived at Ashland, Illinois. He met Crump early in 1922 through a man by the name of Land and purchased an oil lease near Bowling Green in the summer of 1922. Crump secured him a position with the Citizens National Bank at Bowling Green September 22 at which he worked seven months. The first two weeks he helped in the teller's cage and then worked in making up checks for collection. While employed in said bank he saw appellee, Bergen, Wyatt, and two men by the name of Thornley every time they came to Bowling Green. They were most always with Crump or his secretary. He did not know whether Crump transacted any business in Bowling Green.

The witness Main resided at Paxton, Illinois, at one time was county treasurer and was, at the time he

testified, assistant county treasurer. He first became acquainted with Crump in February or March, 1923, at Gibson City. He testified that Crump was a man of very pleasing manner and was selling leases on oil lands and told him he had land near Bowling Green, Kentucky. In connection with some business he had with Crump he went to Bowling Green in March or April, 1923 and went to the Citizens National Bank with Crump at his invitation and was introduced to appellant and a man by the name of Rodes and was entertained at Crump's home. Two carloads of men went to Bowling Green with him. Crump's secretary and himself went out to look at the oil leases and he bought an undivided interest for which he turned in his automobile for $1,500 and gave his note for $1,500. It was called the Briggs lease. When he was back in Gibson City he asked Crump what had become of his note and Crump said to write to the Citizens National Bank and find out from them. He received information by letter but did not remember what officer of the bank signed the letter. From such information from the bank at Bowling Green he located the note at a bank in Smiths Grove, Kentucky. His brother gave a note to Crump and he and his brother went to the Schuyles-Rearick Company Bank at Ashland and met James J. Wyatt. He went there to see about the note his brother had given Crump. Wyatt was trying to collect the note from his brother. The amount of the note was $1,500.

Julius Wilson testified that he lived in Waynesville, Illinois, was a farmer, had loaned money on lands and bought and sold lands for other people and had been in the banking business. In 1923 he was vice president of the Waynesville State Bank and was president in 1924. He first became acquainted with Crump in August, 1924. At this time Bell was cashier of this bank. Crump asked him to go to Waynesville which

he did and while there bought from Crump ten acres of his asphalt land. He next saw Crump in about 10 days either at his house or the bank or in Atlanta. He went to Bowling Green in September and met Crump and his secretary and drove with him to the location of his asphalt plant. He then went to the Citizens National Bank at the request of Crump to see his banker, Mr. Rodes, and Crump told him: "You go down to the bank and meet my banker, Mr. Rodes, and if he says anything about those notes"—that was the notes we had given him for the 10 acres of land, each one of us—"why, tell him they will be paid when they are due." In regard to the notes which were given at that time Crump said that if we were not satisfied after we went down there and looked over the site and what we could learn in regard to it they would be null and void. Later on he took more of the land but didn't get deeds for it but just receipts for it. There was no contract about the first note. On the subsequent notes Crump said he would carry them for three years and that included the first notes but he didn't say that at the time that we were there first—that transaction was done at Waynesville. The first time he was in Bowling Green he talked with Rodes about Crump. Rodes said that Crump was a first-class man, all right in every way—financially and so forth. These conversations with Rodes took place in a side room in front, which was the president's private office. While he and his party were in Bowling Green Crump entertained them at a dinner party. He does not remember whether appellant was present at any of the social affairs given by Crump but believes Rodes was. He bought about 150 acres of asphalt property and received a deed for 10 acres of land from Crump. He invested in cash and notes with Crump about $161,000.

M. M. Ellington testified that he resided at Waynesville, Illinois and is a farmer. He first met Crump in

September, 1924 when the latter drove up to his place in a car with Bell, Wilson and Curry. Bell is about 41 years of age and a man of good standing in the community. He bought 10 acres of the asphalt lands near Bowling Green for $10,000 in the form of two $5,000 notes. He next saw Crump at Bowling Green and Wilson accompanied him. Crump took them to the bank and introduced them to Rodes and then Crump left the bank. He introduced them to appellant also. Crump entertained them during their stay in Bowling Green. He asked Rodes if Crump was capable of taking care of his contracts and Rodes said that he thought he was; that he was the most resourceful man that he had ever met; that during the oil boom in the State of Kentucky they had loaned Crump $65,000 and when the oil business blew up Crump had paid every dollar with interest within three months. He next saw Crump in August at Louisville. He gave Crump all together about $85,000. He has nothing by the way of property or interest in property to show for his investment. He was to receive a deed for 10 acres of land at the beginning and for every thousand dollars invested he was to receive an acre of land— the land was $1,000 an acre but he never received any from Crump. Crump said his banker was the president of the Citizens National Bank at Bowling Green. Crump also said that he would not negotiate those notes until after he had been in Kentucky and investigated the asphalt lands and talked to his banker and seen that things were all right. He has no knowledge whether he negotiated them before he said he would or not. He does not know whether they ever came into the possession of appellant but knows that some of the notes came into the hands of Rodes because they are in judgment.

Robert Rodes testified that he resided in Bowling Green, Kentucky, and had been president of the Citi-

zens National Bank at that city for more than 20
years. There are three banks in Bowling Green which
is a city of about 15,000 population. He has known
W. C. Montgomery of Elizabethtown, Kentucky for
15 or 16 years as a banker connected with the First
Hardin National Bank of that city. The Citizens National
Bank and the First Hardin National Bank occasionally
have some business connections—rarely, however.
That bank is not one of our correspondents.
The oil development in Warren county, Kentucky,
started about 1919 and continued until now. Individually
he was interested in some production and in the
sale of some leases in this oil development and owned
some property which was sold or promoted. Owned
the lease on his farm where he lived which he sold to
Crump. The Citizens National Bank only acted in
the capacity of an escrow agent or anything of a general
banking business. As an escrow agent it would
take care of an agreement made by the various parties
and preserve it until the agreement was carried out.
Knows Crump personally. Crump came to Bowling
Green during the beginning of the oil boom, some
time before 1921. The Citizens National Bank did not
act as escrow agent for any sales made by Crump of
any interests in the lease which the witness had sold
him. He thinks the bank acted as such agent for some
leases or oil property which were sold by Crump or
negotiated through him but there were so many people
there in the business and Crump had a whole lot of
business there and was constantly bringing in people
and selling stuff that he cannot remember. Crump
banked at his bank, but at another bank also. Individually
he does not know of any sales of oil leases or
of oil property by appellant. Appellant was interested
with some friends here in the sale of some leases;
he was interested in the Briggs, Hobson, Hill and
Kissler leases. He sold Crump a house and lot in the

city for $32,000 and he made a down payment. The place was sold and the parties buying it assumed the balance and paid it. Crump sold it with a debt on it. Crump was at Bowling Green possibly two years and maybe a little longer. Remembers the court proceedings which resulted in the receivership of Crump's properties. Was personally acquainted with Crump. Wouldn't say he transacted business regularly at his bank. He was in and out and did some business at the other bank; he didn't do a great deal of business at any bank here. He frequently brought prospective investors to the bank and entertained them at his house. Does not know any business he transacted with them at the bank. His recollection is that he transacted business with them at his residence, that is where he did all his work. Can't say whether he consummated the sale of any oil leases in the bank or in his presence or not. So much of that was going on all the time; he might have done so but he used his residence as his office. Crump was at the bank, in and out, quite frequently, talking trade, just like all other oil men were, and possibly he may have consummated some trades there. He frequently introduced prospective investors to him or appellant or any other officials of the bank. Recalls Mr. Thornley being there several times. Does not recall the visit of Crump and James Thornley. Talked with Thornley a number of times but does not remember any particular conversation he had with him. Recalls the visit of Howard Thornley with Crump to the bank. Also met Wyatt and appellee and several of them Crump had in there from Illinois. They were there more than once. Could not say when they were there. It was during the oil boom. Crump transacted business in Bowling Green during the oil boom. After the oil boom Crump got into the asphalt business. Remembers Mr. Thompson, the attorney, being there. The substance of the con-

versation with Thompson was that the leases owned by Crump and his associates in Illinois had gotten behind and were in debt. Receivership was staring them in the face and these debts were pressing, and Thompson came there to look into it. Advised Thompson to pay the claims up and take over the leases. Thompson said, "The claims are pretty stiff," and the witness said, "Yes, but they can be gotten together and possibly can be reduced." Spent a day or two with Thompson in getting the parties who held these claims in order to keep out of the courts to allow a reduction of the claims; thought it was about consummated but for some reason it did not go through. The bank had very little in claims or liens against the property at that time but thinks appellant and he were interested in those properties and had claims against them; doesn't remember just the extent to which they were interested except that appellant and he and their associates had sold Crump some of these leases and he hadn't paid for them; he never paid for all of them.

M. M. Logan testified that he lived at Bowling Green and had known Crump for five and a half years and represented him in a few instances as his legal advisor and had contracted to sell him some mineral rights in Edmonson county. Thinks the date of the contract was in 1924 or 1925. There were three or four tracts containing 500 or 600 acres. Subsequent to the negotiation of the contract there was a deed executed by him to Crump that was intended to be held in escrow until the property was paid for but through some error on the part of someone the deed was delivered and recorded without the property being paid for; it was never paid for. Has not as yet regained title to the property. There was no mill built upon the property. Crump also owned in Edmonson county 421 acres—221 acres of mineral rights and 200

acres in fee; he purchased a right of way from the Killian property to Nolin River. He paid a considerable portion of the purchase price on these properties.

The witness Richards testified that he lived at Dundee, Kentucky, but formerly resided at Bowling Green. Is a drilling contractor and is acquainted with Crump. Is acquainted with McGuire, Rodes and Beard of the Citizens National Bank; had a contract with Crump to drill on the Bland lease; while working on the Bland lease Rodes came out there with Crump. They came out there and brought the cash with them; does not know which one of them brought the cash and paid it to him. When he went on there as assistant general manager Rodes recommended me to Crump. When Rodes and Crump came out to the Bland lease they paid him over $1,600 in January, 1923. He was paid further sums for his services. When the other money was paid to him he would meet Crump at the Citizens National Bank and he was paid in cash; couldn't say who Crump got the money he paid him with from. Never gave him a personal check; was never paid all the money due him as drilling contractor on the Bland lease. The last money he got was salary due him as manager of the Bland lease; was from Rodes, Beard, Ramsey and Mosely. Did not know Crump until the contract was made with him to drill. Drilled all together 14 wells, part of them were drilled for the Beckley Oil & Gas Company which owned the lease before Crump bought it. His orders the day he was hired as assistant general manager were to pay no attention to anybody and say nothing to anybody; Rodes and Crump were both together when he was hired as assistant general manager until Burgin showed up. They told him when Burgin came he would be the general manager but they says to go ahead and run it according to your ideas and not pay any attention to Burgin.

Horace McDavid testified that he asked Rodes if he knew Crump and that he wanted to get some information regarding the man, also anything he might know regarding the asphalt holdings. Rodes told him that Crump was a good organizer, had a great deal of executive ability and would put over this proposition; that he had some financial reverses in an oil venture but that he had made good on all these undertakings and that while he was not strong financially he was considered to be a fair credit. At that time he had no acquaintance, direct or indirect, with Beard. On the same day he met Beard and shook hands with him, he told him who he was and what he wanted. *Beard said Crump was a promoter; that he never had much credit;* that he had been in several projects; *that he (Beard) did not know anything about the asphalt properties except that some test holes had been made that were purported to make a good showing.*

Howard Thornley testified that he was a farmer living in Ashland, Illinois, and had bought an acre of an oil lease for $1,000 from Crump; that he went to Bowling Green in the fall of 1922 with several others; Crump showed them over the bank building and introduced them to Rodes and Beard. The business he transacted with Crump at Bowling Green was at the bank and at his residence. One time Rodes was with them on his own lease. Had an interest in the Rodes lease which he had bought from Crump.

C. F. Shenk testified that he bought asphalt interests from Crump three different times and went to Bowling Green before he bought any of it. At Bowling Green Crump entertained him at the hotel. Crump took him to the Citizens National Bank to get a check cashed. He loaned Crump a little money at that time. Prior to that time he had loaned Crump $500. The first purchase of asphalt interests was made by him at the home of Crump. The second was

made at his own home and the third was made in Bloomington. Met Rodes in the Citizens National Bank. Doesn't remember ever seeing Beard before the trial.

Henry Henn testified that he bought oil stock from Crump for $1,500 and bought an acre of asphalt land for $3,000 for which he gave his note. Got $1,200 for his oil interests.

J. H. Hubbs testified that he purchased two one-acre oil leases from Crump; went to Bowling Green and was introduced by Crump to Rodes and Beard.

The above is the testimony on which appellee relies to establish the fact that appellant and Crump together with Rodes and other parties named in the 23rd plea conspired together to procure the execution of notes involved in this suit by appellee by fraud. There isn't a scintilla of evidence that any one of the parties mentioned in this plea had any interest in or any connection with Crump's asphalt project except Crump himself. Appellant knew nothing about Crump's attempt to exploit the asphalt lands except by hearsay. The admission of the above evidence wherein numerous investors in Crump's oil propositions testified as to their losses in their speculations which all took place two years before the notes in question were executed by appellee could not fail to have a very damaging effect on the minds of the jury, and, while it is true that the court subsequently excluded this testimony, such exclusion could not remove the impressions made by it, nor does the above evidence to any extent even tend to prove that the appellant had any knowledge of the transaction between Crump and appellee at the time of the execution of the notes sued upon. But one conclusion can be drawn from the evidence in this case and that is that appellant was the holder of the notes sued upon in due course.

The defense of want of consideration cannot be sustained. Section 29 of the Negotiable Instruments Act, Cahill's St. ch. 98, ¶ 49, provides: "An accommodation party is one who has signed the instrument as maker, drawer, acceptor, or indorser, for the purpose of lending his name to some other person. Such a person is liable on the instrument to a holder for value, notwithstanding such holder at the time of taking the instrument knew him to be only an accommodation party. . . ." The transactions between Crump and appellee which resulted in the execution of Exhibit 1 by Crump and the notes sued on executed by appellee in reality constituted a loan from appellee to Crump. Exhibit 1 not only provides for the payment of the pre-existing indebtedness from Crump to appellee but also provides the manner in which the notes were to be paid. Exhibit 1 provides for the payment not only of the original $55,000 but also for the $25,000 evidenced by the notes. The notes themselves were payable six months after date. Exhibit 1 does not distinguish the indebtedness pre-existing with that evidenced by the notes but provides that the payment of all indebtedness shall be by payments of a certain amount each month. It has the effect of changing the terms of the notes as to time and amounts of payment. A loan always implies a promise of repayment. Exhibit 1 was introduced by appellee who then sought to destroy its validity by parol evidence. Its introduction was not limited to any specific purpose. It is insisted by appellant that Exhibit 1 and the notes constituted an integrated contract and that the oral testimony admitted to explain its execution was incompetent. Professor Samuel Williston, in his Restatement of the Law of Contracts, section 224 says: "An agreement is integrated where the parties thereto adopt a writing or writings as the final and complete expression of the agreement. An integration is the writing or writings so adopted." In section 233 this same

authority announces the rule: "Except as stated in section 236 and 237, the integration of an agreement makes inoperative to add to or to vary the agreement all contemporaneous oral agreements relating to the same subject-matter; and also, unless the integration is void, or voidable and avoided, all prior oral or written agreements relating thereto. If void or avoided, the integration leaves the operation of prior agreements unaffected." It is unnecessary to decide this question for conceding that the oral testimony produced was admissible to explain or vary the terms of the notes and Exhibit 1 yet as we have already held that the manifest weight of the evidence is to the effect that the transaction constituted a loan from appellee to Crump and that the notes executed by appellee were accommodation paper and supported by the consideration it becomes immaterial.

The third instruction given on behalf of appellee is as follows: "3. A purchaser of commercial paper who takes the same with actual knowledge of infirmity in the instrument, or defect in the title of the person from whom he takes it, or with knowledge of such facts, that his action in taking it amounts to bad faith, stands in no better situation with reference to defenses which would be availing as against the original payee than such payee himself, and in this case if you believe from the evidence that the plaintiff, Beard, took the notes from Crump with knowledge of such facts, that his action in taking them amounted to bad faith, then you should find the issues for the defendant, Baxter." This instruction is erroneous for two reasons. First, it assumes that there was an infirmity in the notes and a defect in the title of Crump. Second, there was no evidence tending to show that appellant had knowledge of such infirmity or defect or knowledge of such facts that made his action in taking the notes amount to bad faith on which to base the instruction.

The fourth instruction is as follows: "4. If you believe from the evidence in this case that E. Bryant Crump negotiated the notes in question in breach of faith, or under such circumstances as amount to a fraud, and if you further believe from the evidence that the plaintiff, Beard, took the notes from Crump with knowledge of such facts that his action in taking them amounted to bad faith." This instruction is also bad for the same reason that there is no evidence tending to show that appellant took the notes from Crump with any knowledge that the latter was negotiating them in breach of faith or under such circumstances as amount to a fraud. Instructions 6 and 7 are subject to the same criticism in that there was no evidence on which to base them.

Appellee has assigned 15 cross errors, only a few of which have been mentioned in his brief and argument and what we have heretofore said disposes of most of them. It is contended by appellee that the trial court should have granted his motion at the close of plaintiff's case, and also a similar one made at the close of all the evidence, to instruct the jury to find the issues joined in favor of the defendant because the notes sued on were not negotiable for the reason that they were not for some certain sum, in that an attorney's fee might be added to the notes in case of a judgment by confession before maturity and, second, that the notes were not payable at a fixed or determinable future time because they authorized a confession of judgment at any time after the date of the notes. It has long been held in this State that a promissory note containing a power of attorney to confess judgment either before or after the maturity of the note is negotiable. *Sherman v. Baddely*, 11 Ill. 622; *Adam v. Arnold*, 86 Ill. 185; *Keenan v. Blue*, 240 Ill. 177, and this court also has held to the same effect. *Gehlbach v. Carlinville Nat. Bank*, 83 Ill. App. 129; *Shepherd v.*

*Wood,* 73 Ill. App. 486. The notes in question authorized a confession of judgment at any time after the date thereof "for such amount as may appear to be unpaid thereon together with costs and ......Dollars attorney's fees." A photostatic copy of the notes appears in the bill of exceptions and in each note a line was drawn in ink before the word, "Dollars." It is conceded that where the space for the amount of attorney's fees is left blank and no definite sum is written therein that the note implies a promise to pay a reasonable attorney's fee. But it has been held that where a line is drawn through the space left for the amount of the attorney's fee it is the intention of the parties that there shall be no attorney's fee. *Scandinavian American Bank v. Long,* 75 Wash. 270. While this question is one of first impression in this State, we agree with the reasoning of the court in that case and believe that it is sound in principle. It is also assigned as cross error that the court erred in sustaining demurrers to pleas 15 to 22, inclusive. Without attempting to discuss these pleas in this opinion we have given the arguments of counsel in regard to this question careful consideration and have come to the conclusion that the court committed no error in sustaining the demurrers to the pleas mentioned. We have considered the other cross errors assigned but conclude they cannot be sustained.

For the errors indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*